UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾X

MATTHEW HALVEY

    Plaintiff,

             **ORDER**
 -against-         **CV-05-2781 (SJF)(RLM)**

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾X
FEUERSTEIN, J.

  Matthew Halvey (plaintiff) commenced this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of the final decision of defendant Commissioner of Social Security (the Commissioner)

that plaintiff is not eligible for disability insurance (DI) benefits under the Social Security Act (the Act).

The Commissioner moves and plaintiff cross-moves pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure for judgment on the pleadings.

  The only significant issues are whether: (1) the Commissioner's conclusions that plaintiff's back

condition did not meet the Listings criteria and that plaintiff has the residual functional capacity to

perform sedentary work are supported by substantial evidence in the record; (2) the ALJ erroneously

rejected the opinions of plaintiff's treating physicians; (3) the ALJ erred in finding that plaintiff lacked

credibility; and (4) the testimony of the vocational expert constituted substantial evidence where it was

based on the purported unsupported residual functional capacity assessment of the ALJ.

I.       BACKGROUND

A.       Administrative Proceedings

Plaintiff is a forty-one (41) year old male who allegedly injured his back when he fell at work in 1996 and exacerbated his back condition on October 22, 2001 when he bent over to pick up a garbage bag at work.  (Transcript [Tr.] 37, 92, 98, 121, 130).  On August 2, 2002, plaintiff filed an application for disability insurance (DI) benefits, alleging that he has been disabled since October 23, 2001 due to a back condition, which prevents him from performing "any prolonged or exertional activities."  (Tr. 37, 46).[1]  On the Disability Report form completed by plaintiff, he indicates that his back condition arose on October 21, 1996, but that he continued to work until October 23, 2001, "when he had to stop due to [his] disability."  (Tr. 46).  On January 17, 2003, the Social Security Administration (SSA) disapproved plaintiff's claim on the basis that his condition was "not severe enough to keep [him] from working. * * * [B]ased on [plaintiff's] age of 37 years, education of 12 years, and [] experience, [he] can perform light work * * *."  (Tr. 25-28).

By decision dated January 25, 2005, after a hearing at which plaintiff appeared, testified and was represented by counsel, Administrative Law Judge Hazel C. Strauss (the ALJ) found that plaintiff was "not entitled to a period of disability or [DI] benefits under sections 216(i) and 223, respectively, of the Social Security Act."  (Tr. 9-18).  Specifically, the ALJ found that plaintiff "has not been under a 'disability' as defined in the Social Security Act, at any time through the date of the decision (20 CFR §

_____

[1] There is no dispute that plaintiff is insured, for purposes of DI benefits, through December 31, 2006.  (Tr. 145; Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, p. 3).

404.1520(f)).” (Tr. 18).

On February 10, 2005, plaintiff timely filed an appeal of the ALJ’s decision with the Appeals Council. (Tr. 145). On May 6, 2005, the ALJ’s decision became the final decision of the Commissioner after the Appeals Council denied plaintiff’s request for review. (Tr. 4-8). Plaintiff then commenced the instant action for judicial review of the Commissioner’s decision pursuant to 42 U.S.C. § 405(g).

B.      Medical Records

A report of an MRI of the lumbar spine performed on February 23, 2002 at Magnetic Resonance Imaging Associates of Queens, P.C. noted a “[p]rominent L4-5 herniated disc that starts on the right and then progresses so that it becomes much larger more inferiorly so that most of the lateral recesses are occupied by disc material. Moderate spinal stenosis is present at this level. 5-6 mm left herniated disc at L5-S1, causing narrowing of the left neural foramen. Bulging disc at L3-4. Disc protrusion on the left at L2-3.” (Tr. 78).

In responses to interrogatories dated September 30, 2002, Dr. Robert A. Duca noted that he treated plaintiff from October 30, 2001 until September 3, 2002 for a prominent L4-5 disc herniation, moderate spinal stenosis at L5-S1, and left-sided disc L5-S1 compressing the nerve root. (Tr. 91). Dr. Duca noted that plaintiff complained of pain and decreased range of motion in his lumbar spine; that plaintiff’s gait was slow and guarded, with evidence of a slight limp; and that plaintiff used a cane to ambulate. (Tr. 91, 93). Dr. Duca prescribed Celebrex, Norflex and Vicodin. (Tr. 92). Dr. Duca noted that plaintiff’s ability to lift and carry was limited to five pounds, his ability to stand and/or walk

was limited to less than two hours per day, his ability to sit was limited to less than six hours per day, and his ability to push and/or pull was also limited. (Tr. 94). Dr. Duca further noted as follows:

> "[Plaintiff] is severely limited at present with regard to his ability to perform within the requirements of an 8 hr. workday. Due to severe pain and limitations regarding ambulation he must bed rest throughout the day as symptoms become exacerbated. He is unable to lift, stoop, sit, bend, walk, carry for an significant periods since this increases his pain and his mobility is limited. The medications he takes render him drowsy at times, requiring bed-rest. Pushing or pulling foot controls are not indicated at present due to the nature of the [status post-] laminectomy and fusion on his back." (Tr. 94).

Dr. Duca indicated that he did not actually examine plaintiff on the date he completed the interrogatory responses. (Tr. 92).

Plaintiff received follow-up orthopedic treatment with Dr. Duca on a monthly basis from May 14, 2002 until June 10, 2004. However, he missed visits in July 2002, October 2002, December 2002, February 2003, June 2003, September through November 2003 and April 2004. (Tr. 125-141). As of the date of the last examination, plaintiff complained of increased pain with decreased range of motion in all planes of the lumbar spine. (Tr. 125). Dr. Duca noted that plaintiff still ambulated with a cane due to pain and instability. (Tr. 125). In addition, Dr. Duca noted that plaintiff was prescribed a home exercise program. (Tr. 125-129).

Plaintiff was seen by Dr. Richard Johnson, of NeuroAxis Neurosurgical Associates P.C., on June 26, 2002 for neurosurgical evaluation. (Tr. 121). Plaintiff complained of lower back pain radiating into his right leg. (Tr. 121). Examination revealed severe weakness of dorsiflexion of the foot and great toe, and numbness in the L4, L5 and S1 dermatomes. (Tr. 122). Dr. Johnson recommended operative management, including fusion and instrumentation. (Tr. 121).

Plaintiff was treated at St. John's Queens Hospital (St. John's Hospital) from July 26, 2002 until August 6, 2002 for a laminectomy with medial facetectomies and foraminotomies, diskectomies, and instrumentation at L4-5 and L5-S1, and for segmental interbody fusion at L4-5 and L5-S1, which was performed by Dr. Johnson on July 29, 2002. (Tr. 80-90). The records from St. John's Hospital indicate that plaintiff complained of lower back pain since October 2001, with radiation of the pain from the right buttock to the posterior aspect of the right leg to the toes and to the knee in the left leg and numbness in both legs. (Tr. 81-82). Plaintiff was noted to ambulate with a limp. (Tr. 81). He was diagnosed with degenerative disc disease and herniated discs at L4-5 and L5-S1. (Tr. 83, 89).

A radiology report from St. John's Hospital indicates that x-ray images of plaintiff's lumbar spine taken on August 8, 2002 noted prosthetic disc replacements at L4-5 and L5-S1 and posterior fixation. (Tr. 108). Another radiology report from St. John's Hospital indicates that x-ray images taken of plaintiff's lumbar spine on November 20, 2002 noted status-post placement of pedicular screws in L4, L5 and S1. (Tr. 109).

A report from Roslyn Sofer, a physical therapist at Community Physical Therapy, dated October 7, 2002 indicates that plaintiff was treated with physical therapy from April 3, 2002 through May 10, 2002 with no significant change in symptoms and that he re-commenced physical therapy following back surgery on August 30, 2002, at which time he complained of constant pain in his lower back and in both lower extremities below the knees, paresthesias in the left lower extremity and numbness in his right middle toes. (Tr. 110). Plaintiff reported that he had difficulty grooming, walking and climbing stairs, and that he could not dress his lower extremities or carry anything. (Tr. 111). Plaintiff was noted to ambulate with an antalgic gait and to have a shortened stride length. (Tr. 111).

Neurologic examination revealed that both gastrocnemius reflexes were diminished, that there was decreased sensation in both lower extremities, left greater than the right, and that there was decreased range of motion in both lower extremities. (Tr. 111). In addition, Ms. Sofer noted swelling in plaintiff's feet. (Tr. 111). Plaintiff was prescribed physical therapy three times a week for six weeks as well as a home exercise program. (Tr. 112).

Plaintiff returned to Dr. Johnson on November 20, 2002, February 12, 2003, May 21, 2003, August 13, 2003, November 26, 2003, June 2, 2004 and September 29, 2004 for neurosurgical follow-up. (Tr. 114-120). Plaintiff continued to complain of lower back pain with weakness, pain radiating into his lower extremities and numbness in his right foot. (Tr. 114-117). He was prescribed Neurontin and Vicodin for the pain and referred to Dr. Zenetos for a spinal cord stimulator. (Tr. 114-115). He was also encouraged to lose weight and to exercise. (Tr. 116). As of May 21, 2003, Dr. Johnson noted that plaintiff continued to ambulate with a cane, but only on occasion. (Tr. 118). As of August 13, 2003, Dr. Johnson opined that plaintiff reached maximum benefit from physical therapy and advised plaintiff to continue his therapy at home. (Tr. 117).

A report from Dr. Duca dated August 28, 2003 indicates that plaintiff continued to suffer severe pain and discomfort in his lumbar spine, even after the back surgery and three epidural injections. (Tr. 132).

A report from Dr. Deeni Bassam, from the Department of Anesthesiology, pain management office at the Flushing Hospital Medical Center, dated August 29, 2003, indicates that upon examination, Dr. Bassam diagnosed plaintiff with failed back surgery syndrome, epidural fibrosis and chronic right-sided lumbar radiculopathy. (Tr. 113). Dr. Bassam recommended that plaintiff undergo a

6

procedure that would dissolve the lumbar scar tissue (epidurolysis). (Tr. 113).

A report from Dr. Mohammad Khattak at Diagnostic Health Services, Inc. following a consultative examination of plaintiff on October 30, 2003 notes that plaintiff complained of pain in his lower back, pain and tingling in his legs and an inability to bend and lift. (Tr. 98). The report also indicates that plaintiff is able to care for himself, although his sister helps him with the household chores and shopping, and that he stays home and rests. (Tr. 98). Dr. Khattak noted that plaintiff was not in any acute distress on physical examination and that although plaintiff carried a cane, his gait was steady, he sat and stood normally, he got on and off the examination table without assistance, and he was able to rise on his toes and heels and to stoop. (Tr. 98). Dr. Khattak did note that plaintiff was not able to squat and wore a rigid back brace. (Tr. 98). Dr. Khattak's examination of plaintiff's lumbar spine revealed a lower midline operative scar, normal curvature and no paraspinal muscle spasm or tenderness and straight leg raising was negative bilaterally. (Tr. 99). Dr. Khattak noted that plaintiff did not attempt lumbar range of motion exercises. (Tr. 99). Examination of plaintiff's lower extremities revealed decreased sensation on the lateral aspect of the left leg and in the right leg, but no muscle atrophy; range of motion of the hips, knees and ankles was normal, and there was no swelling, effusion or instability. (Tr. 99). Dr. Khattak diagnosed plaintiff as status post-lumbar laminectomy, discectomy and L4-5 and S1 fusion. (Tr. 99). His prognosis was that plaintiff's condition "will improve." (Tr. 99). Dr. Khattak noted that although plaintiff's ability to bend and lift might be moderately limited, there were no limitations in sitting, standing, walking or reaching with gross and fine manipulations in his hands. (Tr. 99). In addition, Dr. Khattak noted that plaintiff did not need any assistive devices for ambulation. (Tr. 99).

A Medical Assessment of Ability to Do Work Related Activities form completed by Dr. Duca on November 9, 2004 indicates that plaintiff is "totally disabled;" unable to lift or carry because it increases his pain and discomfort in the lumbar spine; limited in his mobility, requiring a walking cane for stability due to bilateral leg weakness; and unable to perform any physical or work duties, including climbing, balancing, stooping, crouching, kneeling, crawling, reaching, bending or pushing/pulling. (Tr. 123-124). Dr. Duca notes that plaintiff is "severely limited and unable to eprform [sic] [climbing, balancing, stooping, crouching, kneeling, or crawling] for any significant periods of time. Due to exacerbation of symptoms, [plaintiff] must rest and refrain from any of [these] duties" (Tr. 124). Dr. Duca further notes that plaintiff "is totally disabled and unable to eprform [sic] [reaching, bending or pushing/pulling]/work for an undetermined period of time. [Plaintiff] is in severe pain and discomfort and his mobility is limited. [Plaintiff] requires a walking cane for stability due to pain and bilateral leg weakness and buckling." (Tr. 124). In addition, Dr. Duca reiterates (almost verbatim from the interrogatory responses on September 30, 2002, [see Tr. 94, cited above, supra]) plaintiff's sitting, standing and walking limitations, although he now also indicates that "prolonged sitting" is also "not indicated at present due to the nature of the [status-post] laminectomy and fusion in his back." (Tr. 123).

A report from Dr. Johnson dated November 29, 2004, submitted subsequent to the hearing before the ALJ, indicates that plaintiff still suffers from severe pain, is unable to carry out his usual activities or to do any lifting or carrying, has difficulty doing any walking or standing and requires the use of a cane when he does these activities, and has problems sitting for any period of time and he needs to get up and move about. (Tr. 143). Dr. Johnson opined that plaintiff is not able to work and is "fully

disabled." (Tr. 143). In another report also dated November 29, 2004, Dr. Johnson indicates that he examined plaintiff for a follow-up visit and his condition was unchanged, i.e. he still had back pain and ambulated with a cane. (Tr. 144). Dr. Johnson referred to his prior note of May 2003, in which he indicated that plaintiff used a cane only occasionally to ambulate, and indicated that "on further discussion with plaintiff," plaintiff uses a cane all the time and does not leave the house without it, and this was true even at the time of that prior note. (Tr. 144). Dr. Johnson also referred to his prior note dated February 12, 2003, in which he indicated that plaintiff had reached maximum benefit of physical therapy, and indicated that the therapy was discontinued so that pain management could be initiated. (Tr. 144).

### C.       Non-Medical Records

Plaintiff graduated from high school in 1983 and has not completed any special job training, trade or vocational school. (Tr. 52, 158). For the period from September 1989 to October 23, 2001, the date of onset of plaintiff's alleged disability, plaintiff was employed as a dockworker/forklift operator (from September 1989 to March1991), a handyman/porter (from January 1992 until August or September 1993) and a park worker (from June 1994 until October 23, 2001). (Tr. 47, 75, 161-162). In his position as a city park worker for the New York City Department of Parks and Recreation (Tr. 38, 75, 158, 160), plaintiff surveyed the park, maintained park vehicles, and performed duties as a night watchman and dispatcher. (Tr. 47, 159-160). According to plaintiff, his position as a park worker required him to walk and stand for eight hours a day, to occasionally climb, kneel, crouch and crawl, and to frequently stoop, handle big objects and write. (Tr. 47). In addition, he had to lift

and carry equipment and garbage frequently weighing twenty-five (25) pounds. (Tr. 47).

The function report completed by plaintiff (Tr. 59-69), indicates that he lives with his family; that he usually stays home reading or watching television, except for doctor's appointments; that he does not care for any dependents or pets; that he has trouble sleeping comfortably; that he has no problems with his personal care, i.e. bathing, shaving, feeding himself, or using the toilet; that his sister prepares his meals because he cannot exert himself, but that this pattern preceded the onset of his alleged disability; that he does not do house or yard work because he cannot exert himself; that he goes outside only to see doctors, but he is able to go out alone, drive himself, ride in a car and use public transportation; and that he must take frequent breaks during his daily activities because he cannot stay in one position for too long. (Tr. 59-64). In addition, plaintiff indicated that his ability to lift, stand, walk, sit, climb stairs and squat had been affected and that he uses a cane to walk long distances. (Tr. 64-65). Plaintiff described the pain he experiences when he exerts himself or does anything physical as an ache in his back which radiates to both legs. He indicated that the pain has worsened over time. (Tr. 67-68). Plaintiff takes, or has taken, Celebrex, Vicodin, Neurontin and Skelaxin for the pain. (Tr. 68, 71, 74).


D.     Hearing

1.     Plaintiff's Testimony

At his hearing, plaintiff testified that he lives in the same house with his sister and brother-in-law, and that his sister lives upstairs and he lives downstairs. (Tr. 156-157). He testified that his sister does all of the cooking, cleaning and shopping, and that he just microwaves food or makes himself

sandwiches. (Tr. 172-173). Plaintiff testified that since October 2001, he has not taken any trips outside New York City and he does not participate in any activities outside the home. (Tr. 171). He also testified that he has not driven since October 2001, he cannot take the subway because he cannot climb the stairs, and he cannot ride a bus because of the constant jolting. (Tr. 157, 171). Plaintiff testified that he watches television and reads a lot. (Tr. 165).

Plaintiff testified that he cannot work because he has severe pain in his legs and lower back, no feeling in his right foot, and tingling and numbness in his legs; he cannot move, bend, turn properly or lift and carry heavy objects; and he has trouble sleeping, sitting and lying down for periods of time, putting on his clothes, bathing and using the toilet. (Tr. 163, 167-168, 172, 174). He does feed and dress himself, although his sister helps him with his shoes, and he does shower by himself, although he must alternate between standing and sitting in the shower and he has difficulty reaching some parts of his body. (Tr. 173-174). According to plaintiff, he might be able to lift ten pounds, but he would have difficulty holding onto it. (Tr. 173).

Plaintiff further testified that his back condition had remained essentially unchanged since the back surgery, with the exception that he can stand erect since the surgery when before he was hunched over. (Tr. 164). He further testified that he uses a brace and cane since the surgery. (Tr. 164, 174). Plaintiff testified that he uses a cane all the time to ambulate because his right leg frequently gives out on him. (Tr. 164). Plaintiff testified that he can only walk one or two blocks until he must stop because of severe pain and that he always uses a cane to ambulate; that he can stand for only about fifteen minutes and sit for about fifteen minutes to a half hour; and that his feet frequently swell if he sits for too long. (Tr. 166-169).

Plaintiff testified that he takes Vicodin for the pain, Neurontin for the tingling and numbness, Celebrex for the inflammation and arthritis and Skelaxin for the swelling in his feet. (Tr. 163). He testified that the medications "knock [him] out," make him drowsy and affect his concentration. (Tr. 163). Plaintiff testified that he does not exercise and that no doctor advised him to do so. (Tr. 166, 175). He testified that he went to physical therapy for over a year after the surgery. (Tr. 170).

### 2. Testimony of the Vocational Expert

Melissa Fass-Karlin, a vocational expert, testified that "night watchman/security guard," part of plaintiff's job duties as a city park worker, is listed in the Dictionary of Occupational Titles (DOT) as light unskilled work; and that "dispatcher," which also was part of plaintiff's duties as a city park worker, is listed as sedentary semi-skilled work, although plaintiff testified he performed the work at a heavy level; that "truck driver/helper" is listed in the DOT as heavy work with a Specific Vocational Preparation (SVP) level of 2, which is unskilled; and that "handyman or maintenance mechanic" is listed in the DOT as medium work with an SVP level of 7, which is skilled, but that plaintiff testified that he performed the work at a heavy level. (Tr. 178-179).

Ms. Fass-Karlin testified that a hypothetical individual of the same age, education and prior relevant work experience as plaintiff, who can lift up to ten pounds occasionally and has an option to alternate between sitting and standing as needed, could not perform any of plaintiff's past relevant work. (Tr. 179). However, she further testified that the hypothetical individual could "probably" perform the work of a dispatcher with a sit/stand option. (Tr. 179-180). In addition, she testified that the hypothetical individual could perform the following work, all of which are listed in the DOT as

sedentary unskilled work: (1) a surveillance systems monitor, of which there are 2,916 positions locally and 55,000 positions nationally; (2) order clerk, of which there are 8,715 positions locally and 3,005,000 positions nationally; and (3) assembler of jewelry, of which there are 500 positions locally and 129,000 positions nationally.  (Tr. 180).

Ms. Fass-Karlin further testified that assuming the hypothetical individual could only walk one or two blocks without stopping, could stand for only fifteen minutes at a time and could sit for only fifteen to thirty minutes at a time, and assuming that he or she was able to do this over the course of an eight hour workday, that person would be able to perform the work of a dispatcher, surveillance systems monitor, order clerk and assembler of jewelry.  (Tr. 180-181).  However, Ms. Fass-Karlin testified that an individual who needed bedrest throughout the day and who was unable to sit, stand, stoop, bend, walk or carry anything for any significant period of time would not be able to perform any of those jobs.  (Tr. 181).  She testified that the fact that the hypothetical person needed to use a cane to perform some of those activities would not be an issue.  (Tr. 181).  In addition, she testified that in order to perform the jobs she identified, the hypothetical individual would need to be able to concentrate for two hour periods at a time, with fifteen minute breaks.  (Tr. 182).  She further testified that none of the jobs she identified required climbing, balancing, stooping, crouching, bending, reaching or pushing/pulling.  (Tr. 183-184).

II.     DISCUSSION

    A.     Standard of Review

The standard of review of a denial of disability benefits is "whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." Green-Younger v. Barnhart, 335 F.3d 99, 105 (2d Cir. 2003) (internal quotations and citations omitted); see also Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002) (holding that the district court's review of the Commissioner's decision regarding disability is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 [1971]).

B.    Entitlement to Benefits

Title II of the Social Security Act (SSA) defines "disability" as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . .which has lasted or can be expected to last for a continuous period of not less than 12 months. . . . " 42 U.S.C. § 423 (d)(1)(A). An individual may be determined to be "under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

SSA regulations establish a five-step sequential analysis by which the Commissioner is required to evaluate a claim for disability benefits. See, Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir.

2002); 20 C.F.R. § 404.1520. First, the Commissioner must determine whether the claimant is doing

substantial gainful work. See, 20 C.F.R. § 404.1520(b). If the claimant is not, the Commissioner must

then determine whether he or she has a "severe impairment." See, 20 C.F.R. § 404.1520(c). If a

severe impairment exists, the Commissioner must next consider medical evidence to determine if the

impairment meets the Listings. See, 20 C.F.R. § 404.1520(d). If the impairment does not meet the

Listings, the Commissioner must analyze whether the impairment prevents the claimant from doing his or

her past work. See, 20 C.F.R. § 404.1520(e). Finally, if the claimant cannot perform past work, the

Commissioner must determine whether the impairment prevents him or her from doing any other work.

See, 20 C.F.R. § 404.1520(f). If so, the Commissioner must find the claimant disabled. See, e.g.,

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir.

1999). The plaintiff has the burden of proof on the first four steps, whereas the Commissioner has the

burden of proof on the last step. Green-Younger, 335 F.3d at 106; Shaw, 221 F.3d at 132.

     The ALJ carefully considered and applied the five-step analysis set forth above and correctly

found that plaintiff has lumbar disc disease, but was not under a "disability" as defined in the Act.

Contrary to plaintiff's contention, there was substantial evidence in the record to support the findings,

*inter alia*, that plaintiff's allegations regarding his limitations were not totally credible; that plaintiff did

not sustain his burden of establishing an impairment sufficient to meet the Listings criteria; that plaintiff

has the residual functional capacity to perform sedentary work, lifting up to ten pounds occasionally,

with an option to sit or stand as needed; that plaintiff's past relevant work as a dispatcher did not

require the performance of work-related activities precluded by plaintiff's residual functional capacity;

and that plaintiff's lumbar disc disease does not prevent him from performing his past relevant work as

a dispatcher. Specifically, Dr. Khattak's opinion and plaintiff's own testimony, *inter alia*, that he could lift up to ten pounds, could walk one to two blocks using a cane, could stand fifteen minutes at a time and could sit fifteen to thirty minutes at a time constitutes substantial evidence supporting the ALJ's residual functional capacity assessment.

        C.        "Treating Physician" Rule

The ALJ also properly rejected the opinion of plaintiff's treating physicians, Dr. Duca and Dr. Johnson as inconsistent with other substantial medical evidence in the record and not well-supported by medically acceptable clinical and laboratory diagnostic techniques.

> "The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant. 'A treating physician's statement that the claimant is disabled cannot itself be determinative.' Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). However, SSA regulations advise claimants that 'a treating source's opinion on the issue(s) of the *nature and severity of your impairment(s)*' will be given 'controlling weight' if the opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case records.' 20 C.F.R. § 404.1527(d)(2) (emphasis added)."

Green-Younger, 335 F.3d at 106.

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, * * * the opinion of the treating physician is not afforded controlling weight where * * * the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran, 362 F.3d at 32 (citations omitted); Veino, 312 F.3d at 588 (holding that while the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other

substantial evidence in the record); 20 C.F.R. § 404.1527(d)(2).

The SSA regulations require that an ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider the following factors to determine how much weight to accord the opinion: (1) the frequency of the examination and the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the treating physician's opinion with the record as a whole; (4) whether the treating physician is a specialist; and (5) other factors brought to the ALJ's attention that tend to support or contradict the treating physician's opinion.  20 C.F.R. § 404.1527(d)(2); see Halloran, 362 F.3d at 32. The Commissioner must provide "good reasons" for the lack of weight attributed to the treating physician's opinion.  Halloran, 362 F.3d at 32; 20 C.F.R. § 416.927(d)(2).

The ALJ properly considered the opinions of plaintiff's treating physicians and explained the consistency of those opinions with the record as a whole.  Specifically, in rejecting the opinions of Dr. Duca and Dr. Johnson with respect to plaintiff's disability and limitations, the ALJ stated as follows:

> I do not assign significant weight to Dr. Duca's interrogatory response on September 30, 2002 * * *, as he stated that he did not examine [plaintiff] on that date and the record does not contain any objective findings by Dr. Duca or by any other physician to support the limitations.  I also do not assign significant weight to the statements by Dr. Johnson, submitted subsequent to the hearing * * *.  I find his stated discussion after the hearing concerning the use of a cane is an afterthought by [plaintiff], which does not change the contemporaneous record previously made.  I believe that [plaintiff] has pain, but I do not find that it is so severe as to make him unable to carry out his usual activities or to be unable to do any lifting, carrying, walking or standing.  Contrary to Dr. Johnson's assertion,, [sic] [plaintiff] testified to being able to sit, stand and walk for various intervals at a time and felt that he could lift 10 pounds.  In addition, the issue of disability is reserved for the Commissioner * * * and not for a treating physician (20 CFR 404.1527)."  (Tr. 17).

Upon careful consideration of the entire administrative record and the ALJ's opinion, I find that the ALJ provided "good reasons" for the weight he accorded plaintiff's treating physicians' opinions and properly applied the treating physician rule. Notably, Dr. Johnson's opinion that plaintiff was unable to do any lifting or carrying, and that it was difficult for him to walk, stand or sit (Tr. 143) is unsupported by his clinical notes which indicate, *inter alia*, improvement in plaintiff's posture (Tr. 120) and ambulation (Tr. 118). Moreover, Dr. Johnson's and Dr. Duca's notes are almost entirely devoid of objective post-surgery clinical findings. In addition, Dr. Johnson's notes, submitted subsequent to the hearing, which contravene his contemporaneous notes of plaintiff's condition, are suspect and were properly assigned no weight by the ALJ.

D.      Subjective Complaints

The SSA regulations require that an ALJ consider a claimant's subjective complaints of pain in evaluating the severity of a claimant's impairment. 20 C.F.R. § 416.929. Subjective complaints of pain may serve as the basis for establishing disability even if unaccompanied by positive clinical findings or other objective medical evidence. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); see also Aubeuf v. Schweiker, 649 F.2d 107, 111-112 (2d Cir. 1981). However, the ALJ "is not obliged to accept without question the credibility of such subjective evidence. * * * The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." Marcus, 615 F.2d at 27 (citation omitted).

The ALJ's decision to discredit plaintiff's claims of severe pain and limitations was based on

weighing the objective medical evidence in the record, the inconsistencies between plaintiff's testimony

and the record evidence, and other indicia of credibility and, thus, is supported by substantial evidence

in the record.  See Marcus 615 F.2d at 27.  Specifically, the ALJ found as follows:

> "I find that [plaintiff's] testimony is not fully credible, as he has made inconsistent and inaccurate statements that are not supported by the record. [Plaintiff] testified that he has severe pain in his legs and low back, tingling in his legs and numbness in both legs, right more than left, and no feeling in his right foot except for his big toe.  The treatment notes, however, do not reflect any complaints of numbness in his legs. * * * He also testified that he takes Skelaxin for swelling in his feet, but this medication is a muscle relaxant and the record does not reflect swelling in his feet. [Plaintiff] also testified that his medications 'knock [him] out' and make him drowsy and unable to think.  I also note that [plaintiff] testified that he 'reads a lot' and watches television, so that his pain and the side effects of his medication are apparently not so severe as to significantly affect his ability to concentrate.  Furthermore, in view of the length of time he has been using the medication, this testimony lacks credibility.  Moreover, if the side effects of the medication caused a significant impact on his ability to function, the medication could be adjusted or changed.  The record does not show any complaints that his medication caused significant side effects he claims.

> This testimony as to the side effects of his medication lacks credibility, particularly in view of the length of time he has been using the medication, for more than two years. Notably, also, the long term use of Vicodin, a narcotic analgesic combination, can lead to drug dependence and addiction, requiring larger doses for analgesic effect. See Physician's Desk Reference, 58th Edition, 2004, pages 525-528.

> [Plaintiff] also testified that he does no exercises and was not advised to do so, which is inconsistent with his surgeon's advice on August 13, 2003 and November 26, 2003 * * * to do exercises and to continue physical therapy at home. [Plaintiff] also testified that he was confined to his bed for almost three months after surgery, but this is not reflected in the medical record, which likely would be included if he had to remain in bed for such an extended period.  Such confinement would also result in atrophy in his muscles, but none is shown."  (Tr. 15-16).

The ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial

evidence.  Notably, plaintiff's testimony was contradicted by record evidence indicating, *inter alia*, that

the medications he took caused no side effects (Tr. 51, 68); that he was able to drive and use public transportation (Tr. 62); that he required no assistance taking care of his personal needs and grooming (Tr. 61); and that he was prescribed a home exercise program (Tr. 116-117, 125-129).

E. Vocational Expert's Testimony

Since I find that there is substantial evidence in the record to support the ALJ's residual functional capacity assessment, I also find that it was proper for the vocational expert to base her testimony on a hypothetical taking into account that assessment. Moreover, contrary to plaintiff's contention, the vocational expert did reference the DOT. (Tr. 178-180). Accordingly, the testimony of the vocational expert provided substantial evidence to support the ALJ's determination that plaintiff's back condition does not prevent him from performing his past relevant work as a dispatcher.

III. CONCLUSION

The Commissioner's motion for judgment on the pleadings is granted, the Commissioner's decision is affirmed, and plaintiff's cross motion for judgment on the pleadings is denied.

SO ORDERED.

        S/sjf
SANDRA J. FEUERSTEIN
United States District Judge

Dated:  March 26, 2007
        Central Islip, New York


Copies to:

Brecher, Fishman, Pasternack,
Popish, Heller, Reiff & Walsh, P.C.
222 Broadway, 19th Floor
New York, New York 10038

United States Attorney's Office
Eastern District of New York
147 Pierrepont Street
Brooklyn, New York 11201